T.C. Memo. 2013-125

UNITED STATES TAX COURT

EDMOND AUDREY HEINBOCKEL AND LYDIA ROSE HEINBOCKEL,
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12139-09, 9311-10.          Filed May 13, 2013.

David Harlow, for petitioners.

Kaelyn Romey, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  Ed and Lydia Heinbockel are a happy couple possessed

by entrepreneurial spirit.  In 2005-07 Ed worked full time running a successful

training simulations company, while Lydia--a visibly fashionable and energetic

[*2] woman--ran a personal-shopping business "24-7". The Heinbockels claim that their income from these two sources was significantly offset by losses from three other activities during those years. Although these cases force us to rummage through some of the shopping business expenses to check for substantiation, most of the disagreement--as measured by the money at stake--between the IRS and the Heinbockels is about whether their forays into plane chartering, grape farming, and moneylending were motivated by profit.

FINDINGS OF FACT

I.     Entrepreneurial Ed's Eclectic Experiences

Before Grand Theft Auto, before World of Warcraft, before even Sonic the Hedgehog, Leisure Suit Larry left the Land of the Lounge Lizards to become the unlikely hero of an incredibly successful seven-game series (e.g., Leisure Suit Larry Goes Looking For Love (in Several Wrong Places)) that created a cultlike following.[1] Larry was born and grew to immaturity at a software company called Sierra On-line, and Ed Heinbockel was Sierra's CFO. Although Ed modestly called Larry a "warped idea", Sierra's enormous success in the early days of video games clearly took some entrepreneurial skill. And this Ed showed at an early

---

[1] Seven-game series for *now*. We take judicial notice that Leisure Suit Larry: Reloaded is set to be released on the world in the very near future.

[*3] age. He graduated from Cal Poly-San Luis Obispo in 1980 with a degree in mechanized agriculture, but went back to his alma mater in the mid-80s to improve his business acumen--earning his MBA from Cal Poly-SLO. After a successful five-year run at Sierra--and at about the same time that Larry's colleague, Passionate Patti, was Doing a Little Undercover Work--Ed cashed out his Sierra stock and formed Tsunami Media, Inc.

With Ed at the helm from Tsunami's inception to its eventual sale in 1999, Tsunami produced several interactive video games. One of its most popular creations, a submarine-warfare simulation named Silent Steel, sold over four million units. One of those units landed in the hands of an FBI employee, who was so impressed that he recommended that its technology be adopted to train counterterrorism agents. The FBI called Ed sometime in 1997, and they agreed that he would provide a hundred hours' worth of counterterrorism training. To avoid the perception that the FBI was training counterterrorism agents by having them play computer games, Ed sensibly agreed to create a new entity to foster this relationship--turning the technology that had transformed computer games into technology that transformed personnel training.

With the help of two angel investors--Eric Garen and Newt Becker--whom Ed knew through an investment-banker friend, Michael Kane, Ed started Visual

[*4] Purple, LLC to build training simulations. Although VP's operating agreement listed three managers, Ed ran the show--he was in charge of the day-to-day management, and held a majority ownership interest at all times between 2005 and 2007. Almost immediately after Ed formed VP, it inked a contract with the FBI for over $5 million--and its relationship with the Bureau stayed strong until September 11, 2001. After 9/11, however, VP found its status with the FBI in limbo. Because of that uncertainty, VP realized that it needed to expand its client base to other parts of the intelligence community.

It was fairly successful in doing so, and secured a seven-figure contract with the Department of Homeland Security in 2004. But this deal, although lucrative, was not without risk, because the deal meant VP had to move beyond interactive movies to full 3-D simulations, and Ed and his team ran into a steep learning curve that required them to spend lots of time and money. Although he wasn't putting in hundred-hour weeks as he had during the company's formative years, he was still working "long hours"--on average 40 to 50 hours per week. This costly shift to 3-D simulations, and what Ed called the "lumpy" nature of government contracting, led to wildly variable cashflows during the mid-2000s. More than a few times during these years--including 2005-2007--Ed was forced to inject his own money into VP "as needed to bridge payrolls on occasion, and make ends meet." VP

[*5] reported on its own returns that it fell into the red in 2006 and 2007, though Ed himself was still drawing a good salary that ranged between $150,000 and $200,000.

Sometime in late 2006 or early 2007, a third-party buyer sought to gobble up VP along with five or six other companies. In evaluating this offer, Kane, Garen, and Becker disagreed with Ed over whether his bridge funding should be credited to him as contributed capital. After mediation, Ed decided to buy them out in late 2007. This was a big risk, and Ed "basically sold everything," including his house. The anticipated third-party sale for VP fizzled, and after the buyout Ed continued to run the company, which remains successful to this day.

II.    Long Beach Lydia Lured from LA

Lydia Heinbockel shared her husband's business sense. Growing up in Long Beach, Lydia was an accomplished model from her late teens to her late twenties. She started in business as an LA sales rep for Pierre Fabre, a French pharmaceutical company with a cosmetics line. In 1997, during her stint at Pierre Fabre, she met Ed. They married later that year, and Ed convinced her to move away from Southern California. They bought a home in San Luis Obispo at the end of 1998.

[*6]    Lydia was well aware that her new home was far away from the big cities that she enjoyed. But she sensed an opportunity in the dearth of quality clothing that she saw there. She created Lydia's World (also known as Lydia's Personal Shopping Services), offering designer lines with a personal touch to "very upscale women."[2] She would buy (or obtain on consignment) clothes from about a dozen internationally known designers, and bring those collections to trunk shows that she advertised in email invites. She had no storefront, but started with three trunk shows a year that lasted a week or two each (spring, fall, and holiday), and soon the business expanded into an "all-year-round, all-the-time business" where she would hold trunk shows at various times throughout the year in many of her clients' homes. During any given in-home show, Lydia would spend a few hours with "two or three girlfriends" personally outfitting them, while treating them to champagne and appetizers. So personalized was Lydia's service that she ensured her clients wouldn't unwittingly commit an embarrassing fashion *faux pas*: Lydia said that she had women come in at separate times knowing they would be attending the same party, and she "really secretly" made sure that they bought different dresses. This personal touch persuaded her clients to spend an average of

---

[2] The Heinbockels listed Ed as the proprietor of Lydia's World on each of the Schedules C at issue, but, as discussed *infra*, we reject that characterization.

[*7] $1,500 per outing. Despite the fickleness of the fashion industry, Lydia's ability to market her brands to a loyal customer base brought in gross sales of between $65,000 and $135,000 during 2005 through 2007. Lydia's World reported net profits of more than $7,000 for 2005 and nearly $23,000 for 2006. In 2007, however, it reported a net loss of over $20,000--though this included a deduction of over $30,000 for wages (which really were just cash withdrawals made by Lydia).

III. The Loss-Generating Activities

The Commissioner was more concerned with the Heinbockels' losses. There were three big ones: one reported on a Schedule C, Profit or Loss From Business; another on a Schedule E, Supplemental Income and Loss, Part I, Income or Loss From Rental Real Estate and Royalties; and the third on a Schedule F, Profit or Loss From Farming. We look at each.

A. Collective Flight

The Schedule C activity was Ed's. He called it Collective Flight, and he argues that it was a one-airplane transport company. Collective Flight was not Ed's first foray as a pilot. He began flying when he was only 15, went solo at 16, and won his private license by 17. He credibly defined flying as his "passion", and he later became a commercial- and instrument-rated pilot. When VP won its

[*8] contract with Homeland Security in 2004, Ed saw an opportunity to combine his love for flying with VP's business. He decided that he "really needed an airplane" and that VP, as his "anchor client," "was going to be the prime mover on this." He bought a Mooney Encore, a four-passenger single-engine aircraft. Although Ed testified that he bought it for business purposes, the documents he signed to buy the airplane suggest otherwise: The loan agreement had a space to complete the following clause: "This Property will be used for _____ purposes." The word "PERSONAL" was typed in that space.[3]

Collective Flight never really got off the ground. As Ed put it, his "best-laid plans didn't work out so well." Although Ed occasionally flew the plane to transport himself for VP-related trips, he typically used commercial airlines. When Ed did use his own plane, he often decided against having VP reimburse Collective Flight because of VP's cashflow problems. And Ed never did find any

---

[3] David Harlow, who is currently vice president and general counsel for VP, was trial counsel for the Heinbockels. When Harlow asked Ed questions about this loan agreement, he referred to a copy of it where the word "PERSONAL" had been mysteriously made illegible--or what Ed later called "digital trash." No other word on that copy was unreadable. Counsel for the Commissioner pointed out that the word "PERSONAL" was perfectly legible on the copy the IRS had obtained that was also in the record. We did not admit the copy that Mr. Harlow was using because it was clearly inauthentic. See Fed. R. Evid. 1003. We think it more likely than not that the insertion of the "digital trash" was intentional, and this finding does affect our view of the Heinbockels' overall credibility.

**[\*9]** other revenue sources to lift Collective Flight closer to profitability. He was unable to convince any of his other contacts to become clients because, according to Ed, they were looking to fly in a nicer twin, cabin-class airplane.

Collective Flight's income did not soar. Although it managed to gross about $30,000 in 2006, it reported less than $4,000 for 2005 and $6,000 for 2007. And its reported expenses dwarfed that gross revenue. Those expenses ranged from nearly $100,000 in 2005, to about $75,000 in 2006 and 2007. The aggregate net loss for these years was nearly $210,000.

### B.    "Residential Rental" (Lending Activity)

The Heinbockels also reported a net loss on a Schedule E for 2005 in connection with a "residential rental" in Compton known as the Willow property. They did not, however, actually own that property during any of the years at issue --this claimed loss arose instead from a loan that Lydia had made. Lydia testified that she would occasionally lend money to her brother, David Finzi, to rehabilitate various rental properties, and Finzi would give her "a good, attractive interest rate in return." This particular deal went sour, the property became abandoned, and a bank--First Wilshire Financial--sued. According to Lydia, since her maiden name was also Finzi, she "got drug into this lawsuit." She lawyered up, and at least one attorney, Michael Baum, engaged in a mediation in 2005 that eventually led to an

[*10] award of $230,000 in Lydia's favor. The Heinbockels reported all this very oddly: They claimed an $85,000 capital loss on Schedule D from this "Wilshire Financial" settlement, but deducted about $35,000 in legal fees on their Schedule E. That amount represented what the Heinbockels called the difference--due to "excessive legal fees"--between what they felt Lydia was owed from the settlement and what she received. They did offset the $35,000 by $9,300 in income reported as "rents received"on the Schedule E.

C.     Grape Farming

The Mooney aircraft was not the Heinbockels' only big-ticket purchase in 2004; they also bought a piece of raw land in wine country just north of San Luis Obispo. The Heinbockels both said they bought the land not just to build a home but with the hope of turning part of it into a Zinfandel grape farm. Ed said that establishing a vineyard could allow them to "have fun as a family in the near term and be making money at it." Ed was specifically attracted to the property because it would allow him to return to his farming roots without the time and resource burden of cash crops, and Lydia was excited by a vineyard's potential to attract more clients for Lydia's World. They hired an architect in late 2004 to draft plans for the property, and purchased a tractor--to grade the land--for almost $70,000 on the last day of December 2004.

[*11] But grading the land quickly reaped a harvest of local opposition to their plans. Although Ed said that he believed he was allowed to do minor grading without violating any county rules or regulations, or any of his homeowners association's rules, his neighbors disagreed. The homeowners association filed a complaint with San Luis Obispo County, and in April 2005 the County Department of Planning and Building sent the Heinbockels a notice of violation of three different county code provisions. It ordered them to immediately cease all work on the project until they obtained all the required permits. This stopped the grading and started a "long, protracted battle" between the Heinbockels, their neighbors, and the county. The neighbors also put pressure on the Heinbockels for violating other rules--grading without approval, keeping a fuel tank on the property, and leaving an inoperable vehicle on it as well. Ed and Lydia did eventually win their skirmish with the county--it gave them a permit to move material and establish a vineyard. The neighbors--or, as Ed called them, the "absentee homeowners"--succeeded, however, in trampling down the Heinbockels' plans for a vineyard with a wrath of lawyers. The couple never planted a single grapevine on the property, and eventually sold it in September 2007. With no grape-farming income, the Heinbockels reported net losses of about $49,000 for 2005; $13,000 for 2006; and $8,000 for 2007.

**[\*12]**  Three losing activities that offset a great deal of ordinary income does

sometimes catch the IRS's attention, and the Commissioner issued two notices of

deficiency to the Heinbockels.  The Heinbockels timely filed petitions, and we

consolidated the cases and tried them in San Francisco.  The Heinbockels were

California residents when they filed their petitions.

OPINION

The Heinbockels challenge the Commissioner's determinations to disallow

their losses, and also continue to press their claim that the Commissioner should have

let them deduct more of Lydia's World's expenses.  There are other adjustments, but

they're all computational.[4]

I.      Preliminaries

A.      Burden of Proof

Taxpayers generally bear the burden of proving that they are entitled to any

deductions that they claim.  Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503

---

[4] With one exception--the Heinbockels also put at issue the Commissioner's
interest calculations.  Apart from a few exceptions that don't apply here, however,
we lack jurisdiction over interest that accrues on a tax deficiency that has yet to be
assessed.  See, e.g., Hardin v. Commissioner, T.C. Memo. 2012-162, 2012 WL
2094304, at \*5.

**[\*13]** U.S. 79, 84 (1992); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).[5] This

includes the burden of substantiation. <u>Hradesky v. Commissioner</u>, 65 T.C. 87, 90

(1975), <u>aff'd per curiam</u>, 540 F.2d 821 (5th Cir. 1976).

Under section 7491(a)(1), if taxpayers produce credible evidence about any

factual issue, the burden of proof shifts from them to the Commissioner on that issue.

"Credible evidence is the quality of evidence which, after critical analysis, the court

would find sufficient upon which to base a decision on the issue if no contrary

evidence were submitted." <u>Higbee v. Commissioner</u>, 116 T.C. 438, 442 (2001). To

shift the burden, taxpayers must comply with substantiation requirements, maintain

all the records that section 6001 requires, and cooperate with the Commissioner's

reasonable requests. Sec. 7491(a)(2). The Heinbockels argued at trial that the

burden should shift because they had produced sufficient evidence to prove that they

incurred the expenses claimed as deductions but disallowed by the Commissioner.

We disagree.

The Heinbockels and their trial counsel weren't necessarily the most

cooperative at audit. We find credible the revenue agent's testimony that he

wasn't able to review many documents needed to evaluate the Heinbockels'

---

[5]All Rule references are to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code in effect for the years at issue.

**[\*14]** position because they refused to provide them. The records they did provide at audit weren't sufficient to establish various items of income and deductions, and were often more confusing than helpful. We therefore find that the Heinbockels retain the burden of proving they are entitled to the deductions claimed. See Rule 142(a).

But there are some exceptions. The Commissioner bears the burden of proof on any new matters, increases in deficiencies, or affirmative defenses pleaded in his answer. Rule 142(a)(1); Welch, 290 U.S. at 115; see also Shea v. Commissioner, 112 T.C. 183, 190-91 (1999); Parker v. Commissioner, T.C. Memo. 2012-66, 2012 WL 796414, at \*3. There are a few instances here where the Heinbockels contend that the Commissioner has raised a new matter, and we will take on those contentions as they arise.

B.      Requisite Profit Motive

Sections 162(a) and 212(1) allow a deduction for all ordinary and necessary expenses paid or incurred during the tax year in carrying on a trade or business or for the production of income. Before determining whether deductions are allowable under those sections, however, a taxpayer must show that he is engaged in the activity with the actual and honest objective of making a profit. Dreicer v.

[*15] Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983).

Section 183(a) generally disallows any deduction attributable to an activity "not engaged in for profit."[6] Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The existence of a profit motive is a question of fact that we decide on the basis of all facts and circumstances. See Elliott v. Commissioner, 84 T.C. 227, 236 (1985), aff'd without published opinion, 782 F.2d 1027 (3d Cir. 1986); sec. 1.183-2(b), Income Tax Regs. A taxpayer's statement of his intent is relevant, but we give greater weight to objective facts. See Elliott, 84 T.C. at 236; sec. 1.183-2(b), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., lists the factors that we consider:

• the manner in which the taxpayer carries on the activity;

• his expertise or that of his advisers;

• the time and effort he expends on the activity;

---

[6] Section 183(b)(2) provides an exception to this general rule. If a taxpayer engaged in an activity not for profit, deductions relating to that activity are allowable up to the amount of gross income from that activity minus the deductions that would be allowable whether or not the activity was for profit. See Allen v. Commissioner, 72 T.C. 28, 32-33 (1979).

[*16] • the expectation that assets used in the activity may appreciate in value;

• his success in carrying on similar activities;

• his history of income or losses with respect to the activity;

• the amount of occasional profits, if any, from the activity;

• his financial status; and

• any elements of personal pleasure or recreation.

This list is nonexclusive, and the number of factors for or against the taxpayer is not necessarily determinative. Sec. 1.183-2(b), Income Tax Regs. We are to take all the facts and circumstances into account, and may give more weight to some than to others. See Dunn v. Commissioner, 70 T.C. 715, 720 (1978), aff'd, 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(b), Income Tax Regs.

C. Substantiation

If taxpayers pass the trade-or-business test, they still must prove they are entitled to the deductions that they claim. The most important rule is that taxpayers have to keep records. As we mentioned above, section 6001 and its accompanying regulations tell taxpayers to hold onto records that would enable the IRS to verify their income and expenses. See sec. 1.6001-1(a), Income Tax Regs.

**[*17]** Whether an expenditure is ordinary and necessary is generally a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). A taxpayer must show a *bona fide* business purpose for the expenditure; there must also be a proximate relationship between the expenditure and his business. Challenge Mfg. Co. v. Commissioner, 37 T.C. 650 (1962); Henry v. Commissioner, 36 T.C. 879, 883-84 (1961). For an expense to be "ordinary" means that "the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved." Deputy v. du Pont, 308 U.S. 488, 495 (1940). For an expense to be "necessary" means that it is "appropriate and helpful" to the taxpayer's business. Welch, 290 U.S. at 113. In contrast, except where the Code specifically says otherwise, taxpayers can't deduct personal, living, or family expenses. Sec. 262(a).

When taxpayers prove that they have incurred deductible expenses but the exact amounts are uncertain, we can estimate. See Cohan v. Commissioner, 39 F.2d 540, 542-44 (2d Cir. 1930); Vanicek v. Commissioner, 85 T.C. 731, 742-43 (1985). There must, however, be sufficient evidence in the record to make the estimate reasonable. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). And when we do estimate, we bear heavily against taxpayers whose inexactitude is of their own making. See Cohan, 39 F.2d at 544. And, as we discuss later, there

**[\*18]** are some expenses that the Code doesn't let us estimate at all.  See sec.

274(d); Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd, 412 F.2d 201 (2d

Cir. 1969).

We now turn to apply these rules to each of the Heinbockels' activities.

II.     Schedule C:  Collective Flight

A.      Trade or Business

For 2005 and 2006, the Commissioner disallowed the entire loss reported on

Collective Flight's Schedule C because the activity was not entered into for profit.

For 2007, however, the IRS's notice disallowed substantially all of Collective

Flight's expenses (over 99% of them) because they were not ordinary and necessary

business expenses--but not because the activity wasn't entered into for profit.

Therefore, the disallowed items on the respective notices were as follows:

| Disallowed item | 2005 | 2006 | 2007 |
|---|---|---|---|
| Net loss | $96,028 | $44,258 | --- |
| Other expenses | --- | --- | $31,206 |
| Taxes & licenses | --- | --- | 2,475 |
| Interest--mortgage | --- | --- | 16,983 |
| Insurance other than health | --- | --- | 3,064 |
| Depreciation & sec. 179 expense | --- | --- | 18,650 |

| [*19] Car & truck | --- | --- | 3,853 |
|---|---|---|---|
| Total | 96,028 | 44,258 | 76,231 |

In the Commissioner's pretrial memo, he asserted the same theories as he did in his respective notices. By the time of trial (as well as in his posttrial briefing), however, the Commissioner contended that we should disallow Collective Flight's 2007 expenses because, among other reasons, the activity was not engaged in for profit during that year as well. The Heinbockels argue that this means that the burden of proof should shift to the Commissioner for that year. We agree. After a case has begun, Rule 142(a) places the burden on the Commissioner "in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer." However, we distinguish between new matters and new theories. See Hurst v. Commissioner, 124 T.C. 16, 30 (2005). "[W]e have held that for respondent to change the section of the Code on which he relies does not cause the assertion of the new theory to be a new matter if the section relied on is consistent with the determination made in the deficiency notice relying on another section of the Code." Id. (citation and internal quotation marks omitted). A "new matter" is one that reasonably would alter the evidence presented. A "new theory," in contrast, is just a new argument about the existing evidence. Id. Although the notice of deficiency challenged virtually all of

[*20] Collective Flight's 2007 expenses, proof that a business is engaged in for profit

is reasonably likely to require the presentation of evidence different from that

required to prove that expenses should be allowable because they're ordinary and

necessary. We give the benefit of the doubt to the Heinbockels here, and construe

the Commissioner's new argument for 2007 as a new matter (not just a new theory),

and therefore shift the burden to him for that year. The revised disallowed items are

as follows:

| Disallowed item | 2005 | 2006 | 2007 |
|---|---|---|---|
| Net loss | $95,932[1] | $46,048[2] | $71,109[3] |

[1] On their 2005 return, the Heinbockels claimed Collective Flight incurred a net loss of $96,028. On brief, they claimed $96 less, which decreased the disputed net loss to $95,932.

[2] On their 2006 return, the Heinbockels claimed Collective Flight incurred a net loss of $44,258. On brief, they claimed an additional $1,790 of expenses to increase the disputed net loss to $46,048.

[3] On their 2007 return, the Heinbockels claimed Collective Flight incurred a net loss of $70,957, with $5,757 of gross receipts and $76,714 in total expenses. On brief, they claimed an additional $152 of expenses to increase the net loss to $71,109. The Commissioner--by asserting first that Collective Flight wasn't an activity engaged in for profit (as opposed to relying solely on the argument that certain expenses weren't ordinary and necessary)--is now seeking to negate Collective Flight's entire net loss.

[*21] We look to the usual section 183 factors.

### 1. Manner in which the activity is conducted

We begin by considering whether Ed carried on Collective Flight in a businesslike manner. See sec. 1.183-2(b)(1), Income Tax Regs. A taxpayer operates in a businesslike manner when, among other things, he has a business plan, advertises his goods or services, keeps complete records, and responds to losses by changing what he does. See Engdahl v. Commissioner, 72 T.C. 659, 666-67 (1979); Rinehart v. Commissioner, T.C. Memo. 2002-9, 2002 WL 23954, at *7.

We have to find that from day one Ed did not conduct Collective Flight in a businesslike manner. When he bought the plane, the loan documents specifically stated that he was going to use it for personal purposes. We find the revenue agent credible when he testified that "the only reason" Ed set up Collective Flight was that, through VP, he'd "be assured of renting time on this airplane that would pay the expenses back." After Ed decided that he really needed an airplane for VP, he testified he "built spreadsheets" and "talked to people" and came to the conclusion that, in addition to VP's flying needs, "there was this nice sweet spot" for people around San Luis Obispo that needed to get to northern and southern California. The record, however, includes only a one-page "pro-forma" spreadsheet that Ed

**[*22]** admitted was done in a "stream of conscious[ness]," and did not refer to any specific clients other than VP and Lydia's World.

Ed also failed to keep complete records. There were no written contracts between Collective Flight and VP--his only alleged customer. (Ed did say that he flew for Lydia's World, but he did not bill it.) Although Ed said he provided a few invoices to VP by email, he also testified that he decided against giving most of them to anyone in VP's finance and accounting departments. We have found no invoices in the record for 2006 or 2007; he instead would seek reimbursement from VP for his Collective Flight costs by listing them on his VP expense reports. Even in 2005--when he did send invoices to VP from Collective Flight--he chose not to enter most of the flight charges onto VP's books because "it was kind of silly" to do so as VP "couldn't pay them" because of its cashflow difficulties. That may not have been the only reason. This billing (and overall relationship) was so informal that Ed admitted that VP's other investors probably didn't know about Collective Flight's arrangement with VP. (Those investors later complained about Ed's self-dealing and unauthorized use of funds.) Since Ed controlled what bills VP paid, and Ed was concerned about VP's cashflow, it's not surprising VP's reimbursements to Collective Flight were few and far between. Although even informal recordkeeping is sometimes enough to help show a profit motive, see

[*23] <u>Keenan v. Commissioner</u>, T.C. Memo. 1989-300, 1989 WL 65299, Collective Flight's records were too spotty for us to find that it was carried on in a businesslike manner.

Ed also failed to institute changes in an effort to earn a profit. He testified that when he bought the plane, he thought VP's income stream would allow Collective Flight to charge VP an hourly rate. However, even when Ed did occasionally authorize VP to reimburse Collective Flight, VP did so according to the much-less-profitable IRS standard reimbursement rate of $1.07 per mile.[7] By 2006, after Ed realized the standard rate was all that VP was going to be able to pay Collective Flight, he didn't do anything to change Collective Flight's business model. Rather, without revenue from VP, he didn't "think [he] could fly enough miles to make it pencil out." He said that in retrospect he "should have just sold it at a loss in 2006," but instead he just continued to write off Collective Flight's expenses on Schedule C on both his 2006 and 2007 returns. We also note that he

_____

[7] When asked why VP required a mileage reimbursement rather than an hourly rate, Ed responded: "[A] broader business decision that I needed to make on behalf of VP, and overcome my desire to be billing at an hourly rate where I could have the airplane pencil-out for me and make some money. So I didn't have the luxury because the cash flow and where the company stood in terms of revenues and profitability or lack of profitability to do anything other than that." We think that this is a very important bit of evidence of how Ed felt about his main business interest in VP, parsed carefully, vis-a-vis his activities at Collective Flight.

[*24] used the plane for personal purposes, but never made any attempt to allocate the expenses between his personal and business use of the plane. Ed finally sold the plane in 2009.

Citing <u>Rabinowitz v. Commissioner</u>, T.C. Memo. 2005-18, 2005 WL 1763776, the Heinbockels argue that it was significant that Ed obtained a rule 135 commercial pilot rating somewhere between 2004 and 2005. We did say in <u>Rabinowitz</u> that the "FAA requirements to maintain a rule 135 certificate are more onerous than the FAA requirements for aircraft that are not chartered to the general public," and credited the fact that the taxpayer obtained this certificate when we discussed whether he carried on the activity in a businesslike manner. <u>Id.</u>, 2005 WL 1763776, at *4, *10. In contrast to Ed's activities here, however, the taxpayer in <u>Rabinowitz</u> kept adequate books and records, charged arms-length rates to charter customers, advertised extensively, and implemented changes to try to make the activity more profitable. <u>Id.</u> at *11.

This factor weighs against Ed.

> 2. <u>Expertise of the taxpayer or advisers</u>

The second factor asks whether Ed developed his own expertise or sought guidance from industry experts. <u>See</u> sec. 1.183-2(b)(2), Income Tax Regs. Although a taxpayer needn't make a formal market study in preparation for a trade

[*25] or business, he's expected to undertake a basic investigation of the factors that would affect his profit. Westbrook v. Commissioner, T.C. Memo. 1993-634, 1993 WL 540784, at *7, aff'd, 68 F.3d 868 (5th Cir. 1995).

Ed testified that he did seek out advice in selecting the appropriate aircraft, stating that he "[t]alked to a lot of different pilots, brokers of aircraft, guys who had experience with different models." When asked the names of any of these people, he said "one guy I considered * * * I can't remember his name, he has a company called Rocky Mountain Mooney." Casual conversations with unknown plane salesmen don't help much. Nor do his claims of other forms of training such as having a valid medical certificate, obtaining renewal of his pilot's license, or passing required drug tests--none of these are specific to flying for profit. There was also no evidence that Ed had any discussions with lawyers, accountants, or any other aircraft experts or advisers about the potential profitability of the aircraft. Ed relied on his intuition, believing that VP--a company he controlled--could help him "make a little money with this * * * and have some fun at the same time." This, too, weighs against finding a profit motive.

### 3. Taxpayer's time and effort

The third factor focuses on the time and effort the taxpayer spends on the activity. See sec. 1.183-2(b)(3), Income Tax Regs. Devotion of a significant

[*26] amount of personal time to an activity may show a taxpayer has a profit motive, particularly if he gets no substantial amount of personal pleasure or recreation from it. See id.

We begin by observing that Ed didn't have a whole lot of personal time to dabble in this activity. He was working full time at VP. His flight logs show only 160, 90, and 50 flight hours for 2005, 2006, and 2007, respectively. Despite those numbers, Ed said he spent about ten hours per week with Collective Flight, two to three of which were devoted to flying and the remainder devoted to administrative or prep time. He admitted, however, that he kept no record of those administrative hours to indicate whether he incurred them for VP or for Collective Flight. This factor doesn't weigh in favor of a profit motive, either.

### 4.     Expectation that assets may appreciate in value

An expectation that the assets used in an activity will appreciate in value might also indicate a profit objective. See sec. 1.183-2(b)(4), Income Tax Regs. It's not hard to conclude that wear and tear on an aircraft would cause it to depreciate. Although Ed suggested that the aircraft could've appreciated in value if he would've been "able to support it," we don't find that testimony credible. And he admitted that the plane lost value over the years and was ultimately sold at a loss. This factor also weighs against the Heinbockels.

[*27]      5.      Success in carrying on other similar activities

A taxpayer's previous success in similar activities may show that the taxpayer

has a profit objective even though the activity is presently unprofitable.  See sec.

1.183-2(b)(5), Income Tax Regs.  There's no evidence here, however, that Ed was

previously successful in the aircraft industry.  To the contrary, the Heinbockels

claimed a substantial loss on their 2004 return.

6.      History of income and losses

A series of losses during the initial or startup stage of an activity may not

necessarily show that an activity is not engaged in for profit.  See sec. 1.183-2(b)(6),

Income Tax Regs.  Collective Flight, however, kept on losing money beyond its

startup period.  After it sustained an initial loss in excess of $180,000 in 2004,

Collective Flight's gross income and expenses (as adjusted by the Heinbockels at

trial and on brief) were as follows:

| Year | Income | Expenses | Net loss |
|------|--------|----------|----------|
| 2005 | $3,720 | $99,652 | $95,932 |
| 2006 | 30,105 | 76,153 | 46,048 |
| 2007 | 5,757 | 76,866 | 71,109 |

Collective Flight thus didn't come close to generating a profit during any

year at issue.  And there's no evidence that those losses were due to customary

[*28] business risks. See id. In 2006 after VP limited reimbursement to $1.07 per mile, Ed admitted that he knew he had a dying business model. This is another factor that weighs against the Heinbockels.

### 7. Amount of occasional profits

The seventh factor explores the amount of profits generated in relation to the amount of losses incurred. See sec. 1.183-2(b)(7), Income Tax Regs. Not much exploring to do here. There's no evidence that Collective Flight ever generated a profit before Ed sold the aircraft at a loss in 2009.

### 8. Financial status of the taxpayer

The presence of other substantial income may indicate a lack of profit motive, especially if there are personal or recreational elements involved in the activity. See sec. 1.183-2(b)(8), Income Tax Regs.

Ed's annual wages from VP during that three-year span averaged over $180,000. Ed and Lydia's interest income for that same period (most of which came from VP) averaged over $30,000 per year. Collective Flight's substantial net losses, if found to be deductible, would be available to offset a large portion of the Heinbockels' income, generating significant tax savings. And, as we discuss below, this activity has strong personal or recreational elements.

The Heinbockels still don't have a factor weighing in their favor.

**[*29]**    9.    Elements of personal pleasure

The final factor we examine is whether the activity had elements of personal pleasure or recreation. See sec. 1.183-2(b)(9), Income Tax Regs. There is no doubt that there are plenty of them here. Ed testified, " I love to fly. I'll be real up-front about that. Flying's always been a passion of mine." We find his testimony credible. Ed had bought several other planes in the past and even owned a helicopter. The presence of Ed's personal passion to pilot planes--especially in light of the other factors--weighs heavily against him. See id.

10.    Totality of the factors

After considering all facts and circumstances, we find that Ed has not shown that he engaged in the Collective Flight activity for profit. The Heinbockels are therefore not entitled to the deductions that they claimed to the extent that the deductions exceed the income Collective Flight reported.

B.    Form 4797 Loss

The Heinbockels also claimed a loss of almost $10,000 for 2006 on Form 4797, Sales of Business Property, from the sale of a 2002 GM pickup that they allege was used exclusively for Collective Flight. Although there are several

[*30] problems with the deductibility of this claimed loss,[8] the most lethal is this:

Since we found that Collective Flight was not a trade or business, it logically follows

that the Heinbockels can't deduct a loss on the sale of a vehicle that was allegedly

used exclusively for that activity. See sec. 165(c). Without navigating any other

way to deduct the loss, the Heinbockels aren't entitled to a deduction for it.

III.    Schedule E: Lending Activity

The Heinbockels admit that their claimed lending-activity loss of $25,784

should not have been reported on their 2005 Schedule E, but now argue that it should

have been reported as a trade-or-business net loss of $11,884 on a Schedule C. They

calculate as follows:

| Item | Claimed on return (Sch. E) | P claimed in brief (Sch. C) |
|---|---|---|
| Rent received in lieu of interest | $9,300 | $9,300 |
| Atty fees paid to David Harlow | --- | (15,710) |
| Atty fees paid to Anthony Taylor | --- | (28,782) |
| Atty fees paid to Michael Baum | --- | (54,890) |
| Unreimbursed advances | --- | (3,000) |

---

[8] The Heinbockels claim this vehicle was placed in service in 2002, but there's no evidence that the aircraft activity began before 2004. Furthermore, although the Form 4797 reports a sale price of $12,000, the record shows that the Heinbockels received $15,000.

| [*31] Settlement Proceeds | --- | 230,000 |
|---|---|---|
| Less: principal | --- | (148,801) |
| Legal fees | (35,084) | --- |
| Net loss | (25,784) | (11,883) |

In connection with these adjustments, the Heinbockels also concede that the capital loss of $85,294 claimed on Schedule D entitled "First Wilshire" should really be a capital loss of $25,000 for their investment in "DM Video Stock" that is unrelated to the lending activities (and also concede that the $25,000 is subject to section 1211's capital-loss limitation of $3,000 per year).

Whew, that's quite a shift. Before wading through whether they substantiated the expenses in arriving at that new net loss, we first must determine whether this lending activity was actually a trade or business that would allow them to deduct those expenses. See secs. 162, 183; sec. 1.183-2, Income Tax Regs. If it's not, then we must decide whether the expenses they claimed would be deductible under any other Code section and, if so, whether they were properly substantiated. We also must decide how the money they received should be characterized.

The Commissioner rejects the Heinbockels' new argument that they operated a lending business, asserting that this is just another attempt to deduct personal expenses. The Commissioner emphasizes that the Heinbockels

[*32] completely failed to show that they treated this activity like a business. We agree. Outside of a one-page flowchart that shows various instances where Lydia purported to lend money to her brother, the Heinbockels didn't bring forth any evidence to show that they operated this activity as a trade or business. They provided no books or records, showed no separate accounts, and proved no active solicitation of business.

We find instead an ordinary family deal: They loaned Lydia's brother money when he said he needed some. This is not a business. See sec. 1.183-2(b), Income Tax Regs.; see also McCrackin v. Commissioner, T.C. Memo. 1984-293, 1984 WL 15510 (considering "other indications of a genuine loan business" when loan activity is conducted "with insufficient regularity"). Even if we accepted the flowchart as credible proof, we don't find that making a couple loans to one's brother over a few years' time is a trade or business. See Imel v. Commissioner, 61 T.C. 318, 323 (1973) (finding that the making of less than ten loans over the course of a four-year period didn't elevate that activity to the status of a separate business); Sales v. Commissioner, 37 T.C. 576, 580 (1961) ("We do not believe, in view of the factual matrix of this case, that the making of an isolated loan of $120,000 is so extensive an activity as to justify a finding by this Court that the partnership was engaged in the business of lending money").

[*33] When First Wilshire sued over the abandoned Compton property, the Heinbockels did ring up some lawyer's bills trying to recover the amount of money they had loaned to Lydia's brother for that property. Section 212 might make those expenses deductible if the Heinbockels paid them for "the production or collection of income" or "the management, conservation, or maintenance of property held for the production of income." Sec. 212(1) and (2); see also Colvin v. Commissioner, T.C. Memo. 2004-67, 2004 WL 516195, at *4-*5, aff'd, 122 Fed. Appx. 788 (5th Cir. 2005). (These expenses wouldn't be Schedule C expenses, though. The Heinbockels would have to report them on their Schedule A as miscellaneous itemized deductions subject to a 2% floor. See secs. 63(a), (d), 67(a) and (b); see also, e.g., Estate of Stangeland v. Commissioner, T.C. Memo. 2010-185, 2010 WL 3239181, at *8.)

Even this gets procedurally complicated. The Commissioner argues that the Heinbockels aren't entitled to deduct any expenses because they incurred the legal fees to recover a personal interest. We have to reject this argument; the Heinbockels weren't trying to recover a personal interest in property--they didn't own any part of the property. Rather, the Heinbockels made a loan to Lydia's brother that he used to buy an investment property, in exchange for which they were to receive income in the form of interest (or rent received in lieu of interest).

**[\*34]** So if the Heinbockels spent money to try to recover on that loan, some of those expenses would be paid to collect income and therefore would be deductible on Schedule A. According to our caselaw, although the portion of expenses attributable to the recovery of loan principal isn't deductible, the portion attributable to both the recovery of loan interest and rental income is. See Kelly v. Commissioner, 23 T.C. 682, 688-89 (1955), aff'd, 228 F.2d 512 (7th Cir. 1956).

In Kelly, the lawsuit led to a settlement that resulted in the collection of principal, interest, and rental income. Although the taxpayer didn't produce evidence to allow us to make a precise allocation, we allocated the expenditures among principal, interest, and rental income in approximately the proportions of principal, interest, and rental income recovered. See id. at 684-85. Since the Heinbockels also didn't provide evidence to make a precise allocation, we'll follow a similar path here. For any expenditures that are properly substantiated, we'll multiply that amount by the percentage equal to the ratio of loan "principal", $148,801, to "settlement proceeds", $230,000--64.7%--to allocate to expenditures attributable to the recovery of principal (nondeductible). And we will allocate the remaining percentage--35.3%--to expenditures attributable to either recovery of loan interest or rent received in lieu of interest (deductible).

[*35]  The Commissioner argues, however, that the Heinbockels failed to substantiate that they paid any legal fees.  He seems to assume that the amount deducted on the Schedule E was for fees to a lawyer who forgave the entire amount. He points to a letter from the lawyer describing a writeoff of over $43,000 in legal fees due from the Heinbockels.

The problem for the Commissioner is that the schedule that lawyer prepared shows that the amount written off--actually only $33,000--was attributable to amounts billed in 2006.  It is 2005 that is the year at issue for this activity, and for that year the schedule shows the Heinbockels paid a total of $39,890 to that lawyer. We therefore allow the Heinbockels to deduct 35.3% of that amount for 2005, albeit as a Schedule A deduction subject to the 2% floor.[9]

What about the fees that the Heinbockels claimed they paid to the other two attorneys?  The Heinbockels provided copies of the canceled checks paid both to Anthony Taylor's law firm ($28,782) and to David Harlow ($15,710).  They provided a spreadsheet prepared by them that asserted these fees were paid in connection with the First Wilshire settlement.  They also provided bills and records that showed that both Taylor and Harlow did represent them in reaching

---

[9] The $39,890 is $15,000 less than the amount the Heinbockels claimed--the difference being a retainer that was subsequently returned to them.

[*36] that settlement. The Commissioner failed to address these two amounts in his brief, and we will allow them to deduct 35.3% of both of those amounts, again as Schedule A deductions subject to the 2% floor.

The Heinbockels also claim a $3,000 deduction in 2005 for "unreimbursed expenses." Their spreadsheet says this represents an "unreimbursed 2/5/02 advance" to a "Hatch family trust." The only support they cite for this advance is the flowchart that they created. This is just a summary of their assertion, not proof, and we can find no other evidence that would support the deductibility of this advance.

We now turn to characterizing the items of income on this Schedule E. We find that the first item--$9,300 of "rents received in lieu of interest"--represents interest income that the Heinbockels were owed. This is gross income to the Heinbockels. See sec. 61(a)(4).

We next tackle the somewhat odd characterizations of the "settlement proceeds" less "principal" that were nowhere to be found on the Heinbockels' 2005 return. As we noted earlier, Lydia didn't rent or own the property at issue in the settlement during any of the tax years at issue; she just loaned money to her brother so that he could buy the property. We therefore characterize the "principal" --$148,801--as the loan she made, and the "settlement proceeds"--

[*37] $230,000--as the money she received from the mediation. That leaves, however, an $81,199 accession to wealth. Having rejected the Heinbockels' assertion that this income was part of a trade or business, how should we characterize this income? Since Lydia didn't own any part of this property, it wouldn't be proper to characterize this "gain" as capital. Rather, Lydia was a lender, and received an "attractive" interest rate from her brother. Without any other information on why they received so much more money than the amount they purportedly invested, we characterize the difference as "the settlement of a claim for lost income." Marcus v. Commissioner, T.C. Memo. 1996-190, 1996 WL 189940, at *3. And that lost income is gross income to the Heinbockels. See id.

Lastly, we turn to the Heinbockels' concession that the capital loss of $85,294 claimed on Schedule D entitled "First Wilshire"should really be a capital loss of $25,000 for an investment in "DM Video Stock" that is unrelated to the lending activity. The Commissioner didn't challenge the original capital loss, and hasn't addressed the new capital loss or its new characterization. So we accept the Heinbockels' concession of all but the $25,000 capital loss, which is of course subject to section 1211's limitation.

[*38] IV.     Schedule F:  Grape Farming

The Heinbockels didn't report a single dollar of income on the grape farming Schedules F for the years at issue.  They did, however, claim a bountiful harvest of deductible losses:

| Year | Income | Expenses | Net loss |
|------|--------|----------|----------|
| 2005 | -0- | $49,126 | $49,126 |
| 2006 | -0- | 12,771 | 12,771 |
| 2007 | -0- | 8,486 | 8,486 |

By the time of trial, the Heinbockels claimed some additional expenses for 2005 and 2006, resulting in alleged net losses of $52,953 and $14,094, respectively.

The Commissioner disputes these losses but, as he did with Collective Flight, changed his mind about just why the farming losses were not deductible.  In the notice of deficiency for 2005 and 2006, he disallowed all reported losses because amounts spent during a farm's preproduction period must be capitalized.  Since the Heinbockels never grew a single grape before they sold the property, the Commissioner determined that those amounts should have been added to their basis. The notice of deficiency for 2007, however, disallowed only the depreciation expense of $4,908 (instead of the entire $8,486 loss) for lack of

[*39] substantiation and for failure to show that the expense was ordinary and necessary to the business.

The Commissioner changed his argument in his pretrial memos. The memo for the 2005 and 2006 tax years argued that we should disallow all the losses for those years for failure to substantiate and because the expenses weren't ordinary and necessary--but didn't mention anything about the need to capitalize them. The memo for the 2007 tax year repeated the Commissioner's position in his notice of deficiency--that we should disallow the loss for failure to substantiate and because the expenses weren't ordinary and necessary.

At trial, the Commissioner's position shifted yet again. There, the Commissioner's lawyer asserted that she was "not necessarily" challenging the items "in particular," but "maybe the proportion of the items, but not the items individually." We then asked her whether she was also arguing that the items claimed as deductions were startup expenses and should've been capitalized and added to basis when the property was sold. She answered, "Exactly". Based on that representation, we said to the Heinbockels' lawyer that he needn't spend time proving that the expenses were ordinary and necessary, but could limit himself to evidence and argument about whether those expenses were currently deductible or had to be added to basis. The Commissioner's lawyer did not attempt to correct

[*40] that statement. In reliance on that direction from us, the Heinbockels' lawyer ceased to elicit further testimony about whether the expenses for 2005 and 2006 were ordinary or necessary.

The Commissioner's posttrial brief, however, wasn't consistent with that trial colloquy. In his brief the Commissioner appears to assert two theories. First, he asserts that the 2005 and 2006 losses should be disallowed "for failure to adequately substantiate." The Commissioner later concedes, however, that the Heinbockels "provided sufficient evidence to substantiate that the following Schedule F expenses were actually incurred," but claimed that "each expense is personal and fails to qualify" under section 162. In other words, the Commissioner "contends that despite petitioners providing some receipts for the claimed expenses, they are personal and all aspects of I.R.C. Section 162 have not been met."

The Commissioner asserts in the alternative that the Heinbockels never carried on an active trade or business. He argues that they should therefore "not be allowed any deductions related to their Schedule F for the years 2005, 2006, and 2007," and all of the expenses should be capitalized as startup expenses under section 195. Since the Heinbockels never entered production, the Commissioner

[*41] argues, the costs associated with preparing the land for production should be added to basis when computing gain or loss on the land.

The colloquy we had at trial made clear that the precise issue (at least for 2005 and 2006) was whether the costs associated with the grape farm were currently deductible or should be capitalized. Because of the Commissioner's response, we prohibited the Heinbockels' lawyer from proceeding down the section 162 route for those two years. The Commissioner didn't object to this prohibition. It would therefore be inequitable to allow the Commissioner to argue that the expenses that the Heinbockels claimed on their Schedules F for 2005 and 2006 should be disallowed because they were personal or that they weren't properly substantiated.

So what about the second theory? That theory--which argued for capitalization and against immediate deductibility--would disallow all of the claimed deductions on Schedule F for all these years. For 2005 and 2006, the notice of deficiency had disallowed all the claimed expenses on Schedule F based on a theory of capitalization--albeit under a different Code section (section 447). This is just a new theory (a new argument about the existing evidence) as opposed to a new matter (an argument that reasonably would alter the evidence required), see Hurst, 124 T.C. at 30, so there's no need to shift the burden of proof for those

**[\*42]** two years. 2007 is a different story. Since the Commissioner disallowed only the $4,908 depreciation expense claimed on the 2007 Schedule F, the second theory is a new matter for that year, and shifts the burden to the Commissioner.

We finally turn to the substantive analysis of the Heinbockels' grapefarming. In the midst of the dispute over the theories raised, it's important not to lose sight of one key fact: The Heinbockels admit they never planted a single grapevine before selling the property in late 2007. This is a problem for them. As we've noted, section 162(a) allows a deduction for ordinary and necessary expenses of carrying on a trade or business. In order for the expenses to be deductible under that section, however, the expenses must relate to a trade or business functioning when the expenses were incurred. Hardy v. Commissioner, 93 T.C. 684, 687 (1989). A taxpayer has not "'engaged in carrying on any trade or business' within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized." Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other grounds, 382 U.S. 68 (1965). "Carrying on a trade or business" requires a showing of more than initial research into or investigation of business potential. Dean v. Commissioner, 56 T.C. 895, 902 (1971). The business operations must have actually began. McKelvey v.

[*43] Commissioner, T.C. Memo. 2002-63, 2002 WL 341044, at *3, aff'd, 76 Fed. Appx. 806 (9th Cir. 2003). Until the time the business is "performing the activities for which it was organized," expenses related to that activity are not currently deductible under section 162. Glotov v. Commissioner, T.C. Memo. 2007-147, 2007 WL 1702618, at *2. They are instead classified as "startup" or "pre-opening" expenses. Hardy, 93 T.C. at 687. And startup expenses--which include those incurred "before the day on which the active trade or business begins"--are only deductible over time once an active trade or business begins. See sec. 195.

McKelvey is instructive here. The taxpayer there, a longtime analyst at the California Department of Forestry, bought 39 acres with a barn and cabin included on which he planned to start a tree farm. McKelvey, 2002 WL 341044, at *1. Before buying the land, he conducted an economic and market feasibility study of its commercial viability, and made several visits to the property to survey the forest's health and learn about insects, wildfire hazards, and other risks he might face. Id. He continued to prepare for his tree-farm business for two years after he bought the property. He had a forest-management plan prepared, and test planted 51 pine trees. Id. at *1-*2. All this cost money, and he claimed about $20,000 in expenses. Id. at *2. By the time of trial, though, he still hadn't commercially

[*44] harvested any trees, hadn't planted any more trees, and hadn't decided what species of tree to plant.  Id.

We agreed with the Commissioner that this all meant that the taxpayer did not yet have a functioning business.  Id. at *3.  All his expenses were therefore start-up expenses for which we allowed no current deduction.  Id. at *3-*4.

The taxpayer in McKelvey at least planted a few test trees.  The Heinbockels admit that they never planted a single vine.  Thus, all of the expenses the Commissioner has disallowed (including those for 2007 on which he had the burden of proof) should have been deferred under section 195 until an active trade or business began.  And, since the Heinbockels sold the property in 2007 without ever beginning business, those costs should have been capitalized and added to the basis of the property for computing their gain or loss upon sale.  See sec. 1016(a); Diaz v. Commissioner, T.C. Memo. 2012-241, at *4-*7; sec. 1.1012-1(a), Income Tax Regs.[10]

---

[10] The Heinbockels' argument to the contrary isn't convincing.  They contend that section 1.162-12(a), Income Tax Regs., gives them the option to either deduct or capitalize their ordinary and necessary expenses during the preproduction period.  Since they elected not to capitalize the amounts expended (other than the cost of the tractor) in developing the farm, the Heinbockels say that they should be allowed to expense those amounts.  And they also assert that the uniform capitalization rules of section 263A, which generally apply to property produced by a taxpayer that has a preproduction period of more than two years (as grapes do)--and which require

(continued...)

**[\*45]** We still need to examine the consequences of this conclusion on how the

Heinbockels should have reported the sale of their property on their 2007 return.

They claimed a sale price of $800,000 and a basis of $620,951, which produced a

capital gain of $179,049. Although the Commissioner never challenged the

Heinbockels' claimed basis, he contends--in a footnote in his posttrial brief–that the

Heinbockels "arguably" had already increased their basis in the property by the

amount of their startup costs deducted on the 2005 through 2007 Schedules F.

The record, however, indicates otherwise. The closing statement that the

Heinbockels received when they bought the property shows their purchase price was

$550,000 with about $1,000 in closing costs. The "seller final closing statement" in

2007 when they sold the property for $800,000 shows that they paid $40,000 in

commissions and another $1,000 or so in other closing costs. The final page of that

statement also contains a handwritten itemized list of "additional

---

[10](...continued)
capitalization of direct and indirect costs incurred during the preproduction period shouldn't apply because their "farming activities were dead-stopped as a result of the property owners association's before any planting occurred." The problem for the Heinbockels is that even if we were to buy their argument, their activity had not entered even the preproduction period. The preproduction period doesn't begin before a taxpayer plants the seed. See sec. 1.263A-4(b)(2)(C), Income Tax Regs. And it's undisputed that the Heinbockels hadn't planted any grapes. The Heinbockels were in a prepreproduction period, and so the regulation that they cite doesn't apply.

[*46] selling expenses" (e.g., contracting fees, legal supplies, and various supplies) totaling $24,117. Although no corroboration was provided for those amounts, the Commissioner has not challenged that sum. Adding the commissions, closing costs, and additional selling expenses to the original basis of the property comes to approximately $615,000--within $5,000 of the adjusted basis claimed by the Heinbockels. In any event, in light of the closing statements in the record, we don't agree with the Commissioner that the Heinbockels doublecounted the Schedule F expenses by also adding them to their basis. And because the Commissioner never put the adjusted basis at issue (absent that one footnote), we conclude that all amounts claimed on the Schedules F between 2005 and 2007--as well as the additional items the Heinbockels claimed at trial--should be added to the property's adjusted basis.

V.    Lydia's World

   A.    Lydia's Business

Before engaging the merits of the disputed deduction the Heinbockels claimed for Lydia's World, there's actually a dispute over whose Schedule C business this really was. Each of the three Schedules C for Lydia's World listed Ed as the proprietor. And on brief the Heinbockels continued to assert that this

**[*47]** was Ed's business and thus any self-employment tax incurred due to income from Lydia's World should be allocated to him.[11]  So whose business was this?

With a business named Lydia's World, it wouldn't seem to be a stretch to conclude that this was, in fact, Lydia's business.  It certainly wasn't Ed's.  Throughout trial, Lydia testified that this was her business.  When asked to describe Lydia's World, she described it as "my business;" and her testimony was threaded throughout with the first-person singular:  "I got the idea," "I sent out invitations," "I have many trips," "I purchase [from] designers," "I have kind of a mishmash of all kinds of [inventory]," "I'm marketing myself," "I'm constantly * * * advertising my business," "I have a trunk show business that's called Lydia's World of Personal Shopping Services," and "I'm constantly promoting myself."  Only when it was convenient--such as when a dining receipt claimed as a deduction was paid using Ed's credit card--did Lydia suddenly change and assert that Ed "was very much involved."  But even that comment was revealing--because she said that Ed "was very much involved in *my* business."  Thus, we have no doubt this was Lydia's Schedule C business, and any self-employment tax incurred as a result of income from Lydia's World should be attributed to her.

---

[11] Since Ed had already hit the Social Security tax threshold for all of the years at issue, if he were the owner of Lydia's World it would mean that the Heinbockels wouldn't owe any additional FICA taxes on that business income.

**[*48]** B.     Expenses

Now we turn to the items in dispute.  Lydia deducted a wide range of business

and nonbusiness expenses on the Schedule C for Lydia's World.  The disputes over

some of the expenses are nothing more than routine substantiation.  While the notices

of deficiency disallowed certain expenses, the parties made additional arguments

(and some concessions) both at trial and in posttrial briefing, which placed many

other amounts in dispute.  We cut them into categories and sew up each in turn.

1.     Section 274 expenses

Some deductions demand more substantiation than others.  See secs. 274,

280F.  These include travel, meals and entertainment, and certain forms of "listed

property."  "Listed property" includes any passenger automobile.  Sec.

280F(d)(4)(A).  To deduct items in these categories, a taxpayer must show that the

item claimed is directly related to or associated with the active conduct of her trade

or business.  Sec. 274(a).  She must also provide "adequate records" showing the

amount of the expense, the time and place of the expense, the business purpose of

the expense, and the business relationship to her of the persons entertained.  Sec.

274(d); sec. 1.274-5T(c)(2)(I), Temporary Income Tax Regs., 50 Fed. Reg.

46017 (Nov. 6, 1985).  "A contemporaneous log is not required," but we will

**[\*49]** afford a statement that isn't made at or near the time of the expenditure the same degree of credibility only if the corroborative evidence has "a high degree of probative value." Sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985); see also Reynolds v. Commissioner, 296 F.3d 607, 615-16 (7th Cir. 2002) (noting that keeping written records is not the only method to prove section 274 expenses but "alternative methods are disfavored"), aff'g T.C. Memo. 2000-20. These strict substantiation requirements don't allow us to use the Cohan doctrine to estimate expenses. See Sanford, 50 T.C. at 827.

We'll march each category of section 274 expense down the runway for a closer look.

a.      Car expenses

| Year | Claimed on return | P claimed in brief | R allowed in NOD | R allowed in brief |
|------|------|------|------|------|
| 2005 | $12,679[1] | $12,220[2] | $788 | -0- |
| 2006 | 13,430 | 16,103 | -0- | -0- |
| 2007 | 8,759 | 6,655[3] | -0- | -0- |

[1] This is the sum of $788 in car and truck expenses and $11,891 in vehicle rent.

[2] This is the sum of $788 in car and truck expenses and $11,432 in vehicle rent. The Heinbockels on brief also concede that it wasn't proper to claim a depreciation deduction.

[*50] [3] In addition to conceding $2,104 in car-and-truck expenses, the Heinbockels on brief concede that it wasn't proper to claim the depreciation deduction ($2,565) for the vehicle.

Consistent with her sense of fashion, Lydia cruised in style. For the first 11 months of 2005, she leased a Mercedes for approximately $1,000 per month, and deducted 100% of those payments. When Lydia began leasing this vehicle in September 2002, however, the lease stated that the primary use was for "personal, family, or household purposes." In December 2005 when that lease ended, she bought a Land Rover for just under $70,000. She claimed a standard mileage deduction for 100% of the miles driven with this car for 2005 and 2006, and 90% of the 2007 miles.

Lydia justified writing off substantially all of the vehicles' expenses by saying "if you understand my business and the marketing involved, you will pretty much see that I'm marketing myself 24-seven, and I use that car for everything to do with the business. I'm constantly dropping off clothes, you know, advertising my business, because I'm a walking, talking testimonial [of] who I am." When asked to give an example of what she did to rack up the business miles, she said she would "wake up in the morning and go to the gym," a place she said she did "30 to 40 to 50 percent" of her business. After her workout, if somebody was waiting at the gym for an order, she would "have it in the car." After that, Lydia

[*51] said she would shower, "get dressed in something fabulous," then "drive and *
* * drop off two or three pieces of clothing to people that have ordered stuff." In summary, Lydia said "it's hard to divide between the business and me, and me and the business, I mean, I'm constantly promoting myself 24-seven. There's not a time when I'm not."

We mostly agree with her that it was often difficult to distinguish her business and personal activities. But Lydia's proclivity to knit together these two sides of her life--combined with her lack of recordkeeping--doom her under section 274. She didn't provide any contemporaneous logs or records indicating the time or number of miles driven, much less bring forth any records that detailed the business purpose of each trip she made. Although she indicated that she logged all of her appointments in Outlook, she didn't provide any documents to support this assertion. And because we can't just estimate these expenses, we disallow them in their entirety.

[*52]             b.        Travel and meals and entertainment

|  Year | Claimed on return | P claimed in brief | R allowed in NOD | R allowed in brief |
|---|---|---|---|---|
| 2005 Travel | $1,465 | $862[1] | -0- | -0- |
| 2005 M&E | 800 | -0-[1] | -0- | -0- |
| 2006 Travel | 6,613 | 6,616 | -0- | -0- |
| 2006 M&E | 682 | 682 | -0- | -0- |

[1] At trial and on brief, the Heinbockels say that $1,403 of the travel ($603) and meals and entertainment ($800) expenses for 2005 should be reclassified as supplies.  According to the credit-card summary in the record, it appears those reclassified amounts are for various purchases from Target and Costco.  Although the Heinbockels say those amounts were not already accounted for in supplies or costs of goods sold, they haven't proven that to be the case nor have they adequately substantiated the reclassified amounts.  We therefore disallow the amount they seek to reclassify.

The Heinbockels did a bit of traveling and dining in 2005 and 2006--purportedly for Lydia's World.  They did not, however, support a single one of these expenses with contemporaneous logs or similar statements that detailed the time or place of the expense or its business purpose as section 274 generally requires.  This proof consisted instead of Lydia's testimony as she went through these expenditures one by one--occasionally in some detail--that explained where she was, what she was there for, and why she thought the expense deductible.  Although there were a few receipts in the records to refresh her memory, most of the recollection came from Lydia's year-end credit-card summary statement.

**[*53]** Is that kind of memory jogging years later--supported by evidence such as a credit-card statement (or occasionally a receipt)--enough to meet the strict substantiation requirement to provide "adequate records?" See sec. 274(d); sec. 1.274-5T(c)(1), Temporary Income Tax Regs., supra. Generally speaking, the answer is "no", because such testimony is not an "account book, diary, log, statement of expense, trip sheet, or similar record * * * made at or near the time of the expenditure or use," much less a record that explained the business purpose. Sec. 1.274-5T(c)(2)(ii), Temporary Income Tax Regs., supra.

The regulations however, do provide an exception. If a taxpayer isn't able to substantially comply with the requirements of section 1.274-5T(c)(2), Temporary Income Tax Regs., with respect to an element of an expenditure or use, she must establish that element by pinning two prongs into the record: (1) her own statement-- whether written or oral--"containing specific information in detail as to such element"; and (2) "other corroborative evidence sufficient to establish such element." Sec. 1.274-5T(c)(3)(I), Temporary Income Tax Regs., 50 Fed. Reg. 46020 (Nov. 6, 1985). The regulation continues, in greater detail, if that element is the cost or amount, time, place, or date of an expenditure or use, the corroborative evidence shall be direct evidence, such as a statement in writing setting forth detailed information about such element, or documentary evidence such as a

**[*54]** receipt.  Id.  If that element is either the business relationship to the taxpayer of persons entertained, or the business purpose of an expenditure, the corroborative evidence may be circumstantial.  Id.  The corroborative evidence supporting a noncontemporaneous statement "must have a high degree of probative value to elevate such statement and evidence to the level of credibility reflected by a record made at or near the time of the expenditure or use supported by sufficient documentary evidence."  Sec. 1.274-5T(c)(1), Temporary Income Tax Regs., supra.

In sum, it is possible that documentary evidence such as receipts coupled with credible testimony can meet section 274's strict requirements.  See Efron v. Commissioner, T.C. Memo. 2012-338, at *18.  While reserving our decision as to whether Lydia established the amount, time, and place of the expenditure, we focus our analysis on the business-purpose element.

In 2005 and 2006, Lydia (usually accompanied by Ed) took various trips, including ones to Los Angeles, Santa Barbara, Long Beach, San Diego, Santa Fe, and New York.  The Commissioner alleges that these were all personal trips, and that many of them were suspiciously timed to coincide with birthdays and other special occasions.

We look at each.

[*55]                           i.        Los Angeles

Lydia testified that her trips to Los Angeles were to attend the California Mart, and on one occasion to hold one of her trunk shows there.  The California Mart was where Lydia said she went four or five times a year to do her "primary buying."  She said she would analyze clothing from hundreds of designers and sit down with them to figure out whether the clothing lines were "bohemian" enough to attract her upscale clientele.  While she was in LA, she would often dine with various designers and (curiously, inasmuch she was their potential customer) would pick up the tab.  These outings, Lydia said, led to great relationships with the designers.  As for the trunk show she held in LA, she said she invited several of her "friends and colleagues and friends of friends" to an "actual beautiful room" at the Hyatt Regency.  Although she said it was successful, she "realized it was too much of a schlep to schlep all the clothes to Los Angeles," and she never did another one after that.

Although she was able to recite in detail some of these expenditures, we often found her explanations about these alleged business trips a bit off.  For example, when referring to a receipt from the Avalon Hotel in Beverly Hills, she talked about how she stayed there for a few nights while buying inventory at the California Mart.  The receipt, however, detailed four restaurant outings and two

[*56] overnight parking charges over a three-day span--and not one charge for a room. For another one of her alleged buying trips to Los Angeles, the hotel receipt was under Ed's name and indicates that three persons stayed in the room, and the charges consist solely of private dining and valet parking. As we noted earlier, Lydia--when questioned about why a hotel bill that Ed had paid had been written off as a business expense--argued that Ed "was very much involved" in her business. As we explained earlier, we find this assertion inconsistent with her other testimony throughout the record. We therefore find that many of these trips mixed business with pleasure, and with neither contemporaneous statements of business purpose nor the ability to estimate, we find that none of the Los Angeles trips and related meals are deductible.

ii.    San Diego

Lydia testified that she went down to La Jolla (an affluent resort community in San Diego) to check out several designers. She indicated that her trip yielded "a lot of great, great new designers" because their stores had "the same type of beachy kind of attire, very casual, that goes over well in San Luis Obispo." Lydia said she had to rent a car during this trip because she and Ed flew down. On cross-examination, however, she admitted that she had claimed deductions for the cost of two rental cars. The credit-card summary statements show the Heinbockels also

[*57] visited Sea World. That same statement showed minimal clothing purchases --no more than a couple hundred dollars--leading us to find this trip was more personal shopping than buying inventory for a personal-shopping business. The hotel receipt was again in Ed's name--and included multiple charges for room service, a spa fee, and various other nonoccupancy charges. When asked about the spa charge, Lydia said it was a charge for her to work out before an appointment. Then when asked whether the workout was personal or business, Lydia answered: "Well, let's see, I think I have to make myself look good so I look good in the clothes, so I'll say business."

We'll say personal. And we'll disallow the amounts deducted in connection with this trip.

### iii.    Santa Barbara

Lydia said she went to Santa Barbara "every couple months to check out the new stores and what kind of lines they're carrying and anything that's any interest." She said she deducted two meal expenses during trips to Santa Barbara. She said one of those was at a place called Senor Lucky's. However, Senor Lucky's is in Santa Fe--not Santa Barbara. Substantiation fails there. The other meal was for her lunch with her assistant when they were "check[ing] out several stores." The aroma of personal expense is strong here, and we find the lack of detail required to

[*58] prove a business purpose. We will allow no deductions for any Santa Barbara meals.

### iv.    Santa Fe

Lydia traveled with Ed to the Santa Fe area in both 2005 and 2006 around the date of Ed's birthday. Lydia claims they went to "a big kind of like festival where they have a lot of different vendors." Although she forgot what the festival is called, she indicated "it's like a really great time to go to Santa Fe." She indicated that during this trip, she considered expanding into men's clothing lines--"with the cowboy style that San Luis Obispo likes"--but decided against it. Although she deducted the costs of various meals she said she had with suppliers during that time, there were also expenses claimed for meals apparently with just her and Ed-- including at Senor Lucky's. Such obvious elements of personal pleasure lead us to disallow these expenses.

### v.    New York

Lydia also deducted a hotel stay with Ed in New York, as well as various limousine charges during their time there. She claimed this trip was to attend the Coterie show, which is a "fantastic show that has all the designers from all over the world." And because she was in New York, Lydia decided that "it would be safer" to take a limo instead of catching a cab. She said that it was in New York she

[*59] found the Vivian Uchitel line from Buenos Aires and the Heike Jarick line from Germany. However, she had testified earlier that she found the Vivian Uchitel line at a designer at the California Mart, and that she had recommended Heike Jarick to a designer in Santa Fe (who subsequently carried that line) the year before she claimed to have found her in New York. Without contemporaneous records, this testimony--in addition to being inconsistent--does not contain the detail needed to claim a deduction under section 274.

### vi. Long Beach

Lydia deducted some expenses related to a trip back to Long Beach--her "stomping ground" where she was born and raised. She said she went down on that occasion to "check out some of the boutiques on Second Street." She didn't, however, provide any details about the designers or meetings that occurred when she was visiting. This doesn't come close to meeting section 274's requirements.

### vii. Wine tasting

Lydia deducted close to $500 for a wine tasting tour in a limo--an "incredible trip" on which she initially said she invited three of her "best customers that spent * * * over $10,000" in 2006 with Lydia's World. On cross-examination, she admitted that there were eight people (four couples)--including her and Ed, as well as her assistant, Karen Barcelas, and her husband. Although Lydia initially

**[*60]** claimed that Karen was one of her top clients, she had no idea how much Karen actually spent.  This vague (and inconsistent) testimony also doesn't cut it.

### viii.    Summary

Lydia deducted a few other expenses for meals she said she had with designer representatives in and around San Luis Obispo, but we likewise find the testimony describing those occasions falls short of section 274's strict standard.  The absence of contemporaneous logs combined with Lydia's often inconsistent testimony, and the numerous occasions where these alleged business trips appeared to be draped with personal pleasure, cause us to find that none of the travel and meals and entertainment expenses met the business purpose requirement of section 274.

### c.    Advertising/Gifts

| Year | Claimed on return | P claimed in brief | R allowed in NOD | R allowed in brief |
|---|---|---|---|---|
| 2007 | $11,054 | $11,054 | -0- | $75 |

Lydia's World claimed over $11,000 of advertising expenses for 2007.  That amount, though, didn't jibe with Lydia's testimony.  She testified that "I don't spend money on ads, I don't--it's all based upon word of mouth, on me, and promoting myself."  We agree with the essence of that testimony.  And we find

[*61] those expenses were really gifts to those who helped her with her shows.[12]

Her accountant for 2007, Harold Ritter, testified that "it was common practice to dispose of some of the leftover inventory as gifts, and   * * * record these as marketing expenses."

The cost of gifts "may be an ordinary and necessary business expense if the gifts are connected with the taxpayer's opportunity to generate business income." Bruns v. Commissioner, T.C. Memo. 2009-168, 2009 WL 2030886, at *8.  Business gift deductions pursuant to section 162 are restricted to $25 per donee per taxable year.  Sec. 274(b)(1).  Section 274's onerous requirements also apply.  See sec. 274(d).  A taxpayer who claims a deduction for a business gift is required to substantiate it with adequate records or sufficient evidence corroborating his own testimony as to (1) the cost of the gift; (2) the date and description of the gift; (3) the business purpose of the gift; and (4) the business relationship of the person receiving the gift.  Sec. 1.274-5T(b)(5), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).  Although Lydia detailed in some cases what was given

_____

[12] After claiming only $45 of advertising expenses on Lydia's World's 2005 Schedule C, the Heinbockels on brief claimed $4,712 for that year.  But because we find that the amounts claimed for 2005 were not advertising expenses masked as gifts, we don't subject them to section 274's strict requirements but rather deal with them later when discussing a variety of miscellaneous expenses in dispute for 2005.

[*62] away, she didn't indicate the recipient of the gift, much less its business purpose. On brief, the Commissioner allowed the Heinbockels to deduct $75: $25 per donee for gifts to three individuals--her secretary Karen Barcellas and the two other clients that Lydia claimed attended the wine tasting event. Because of the failure to adequately substantiate any of the amount claimed, we will not allow a deduction greater than the Commissioner has.

### d. Home Office

| Year | Claimed on return | P claimed in brief | R allowed in NOD | R allowed in brief |
|------|------|------|------|------|
| 2005 | -0- | $2,802 | -0- | -0- |
| 2006 | -0- | 2,040 | -0- | -0- |

Although the Heinbockels didn't claim a home-office deduction on any of the returns at issue, they now argue that they did incur home-office expenses in 2005 and 2006 in connection with Lydia's World.

Section 280A(a) states: "Except as otherwise provided in this section, in the case of a taxpayer who is an individual * * *, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." The Code then provides an exception to this general rule to permit a deduction for home-office

[*63] expenses "allocable to a portion of the dwelling unit which is exclusively used on a regular basis * * * as the principal place of business for any trade or business of the taxpayer." Sec. 280A(c)(1)(A). A taxpayer may deduct home-office expenses if she shows her home office is:

- used for a trade or business;

- used exclusively for that purpose; and

- her principal place of business.

Although Lydia had a bit of difficulty recalling where she lived during the years in question, the spreadsheets detailing the home-office deductions indicate the Heinbockels lived in three different residences. They started 2005 in a 2,200-square-foot house (204 square feet allocated to the home office), then later that year downsized to an 1,850-square-foot apartment (150-square-foot allocation). Then, sometime in 2006, they moved to a 4,100-square-foot home (255-square-foot allocation). Although she didn't describe those locations separately, Lydia testified that in each of those locations "there was always one room pretty much dedicated to * * * Lydia's World" where she would store "tissue paper, bags, some inventory, [and] boxes." When asked whether there were any other items in that room, however, her answer wasn't unequivocal: Lydia said that "[i]t's kind of a room designated for a lot of stuff, like the closets full of clothes and there's, yes, boxes. I

[*64] kind of designate it to kind of close the door."  In light of that testimony, we find that none of these spaces were used exclusively for Lydia's World, and the Heinbockels can't deduct home-office expenses for them under section 280A(c)(1)(A).

The Heinbockels, however, point out that section 280A's general prohibition on deducting home-office expenses doesn't apply to the extent that an expense is allocable to space within the dwelling unit which is used "on a regular basis as a storage unit for the inventory or product samples" and is the "sole fixed location of [the] trade or business."  Sec. 280A(c)(2); see also Banatwala v. Commissioner, T.C. Memo. 1992-483, 1992 WL 203306, at *4.  We find Lydia's testimony on this issue questionable at best.  The Commissioner confirmed with Lydia that the 1,800-square-foot apartment that she, Ed, and their son rented had only two bedrooms. Although Lydia denied that her son lived in the same room as she and Ed, she didn't explain where her son slept.  Even if we accepted Lydia's testimony, though, she would still need to establish that she maintained a *bona fide* inventory to qualify for the section 280A(c)(2) exception.  Ritter testified, however, that Lydia didn't have a "running inventory"--rather, she would just order for her shows whatever would sell. Although there would be some inventory left over, Ritter credibly said she gave most of it away to those that helped her with the shows.  We

[*65] don't think hanging a couple dozen items of clothing in a closet is enough to make the room that closet is in a "storage unit for inventory." We conclude that Lydia is not entitled to a home-office deduction under section 280A(c)(2) for 2005 or 2006.

### 2. Other Adjustments

#### a. 2005

| Item | Claimed on return | P claimed in brief | R allowed in NOD | R allowed in brief |
|---|---|---|---|---|
| Returns | $1,130 | $2,916 | $1,130 | $1,130[2] |
| COGS | 26,848 | 91,477 | 26,848 | 43,315[1] |
| Advertising | 45 | 4,712 | 45 | 45[2] |
| Insurance | 834 | 840 | 834 | 834[2] |
| Interest: other | -0- | 817 | -0- | -0-[2] |
| Office expense | 920 | 48 | 920 | 48 |
| R&M | 50 | -0- | 50 | -0- |
| Supplies | 630 | 1,403 | 630 | 630[2] |
| Utilities | 1,794 | 2,386 | 1,794 | 1,794[2] |
| Other expenses | 6,641 | 7,179 | 6,641 | 6,641[2] |

[1] The Commissioner in his brief concedes that 50% of the sales are allowable as costs of goods sold for 2005. Based on the Heinbockels' brief, gross receipts were $86,629. Therefore, we construe the Commissioner's concession to be $43,315.

[2] Although the Commissioner didn't specifically disallow each claimed increase in expense, he generally asserts that the Heinbockels failed to substantiate the claimed increases.

[*66] Other than the section 274 expenses discussed above, the Commissioner's notice of deficiency allowed all the other expenses that Lydia claimed for 2005. However, at trial the Heinbockels argued for more (with an occasional concession for less). (The Heinbockels seem to have hired somebody to go through the records to try to organize them at some point after 2005. This led to some very significant changes--they now argue, for example, that the $7,649 net profit as originally reported on the Schedule C should really be corrected to a net loss of $38,230.)

The Heinbockels didn't explain these adjustments at trial. They also didn't do so in their brief; instead referring to them being "summarized in Attachment E." That attachment contains various computerized spreadsheets that they created. We treat these spreadsheets as argument--not evidence--and use them only to guide us to the appropriate underlying document. See Rodriguez v. Commissioner, T.C. Memo. 2009-22, 2009 WL 211430, at *2.

The records for Lydia's World rivaled Fibber McGee's closet for their organization. Lydia testified that in 2005 (as well as 2006) she had a "young girl named Lindsey that was helping [her] do the accounting." But, Lydia explained, Lindsey "was kind of a babysitter and then she also was just learning Quickbooks." Ritter--the accountant that Lydia had hired to recreate records for the 2007 tax

[*67] year--explained that he inherited records in Quickbooks that were in "a state of disarray." Ritter said that status "was based on not understanding how to use the program." With respect to 2005, after attempting to review the claimed increases, we agree that the records were more than a bit out of order.

We start with the very large increase in cost of goods sold. Though cost of goods sold is technically an adjustment to gross income and not a deduction, Lydia still has to substantiate the amounts she claimed. See Rodriguez, 2009 WL 211430, at *2. Lydia is now claiming an amount---over $90,000--that is more than triple what the Heinbockels claimed on the 2005 return. In support, she cites a mishmash of Quickbooks entries, credit-card statements, bank statements, invoices, and the occasional receipt--but nothing that would allow us to even come close to tying the invoices and various statements provided to any schedules. Moreover, this revised amount exceeds their revised calculation of gross receipts by almost $5,000. In light of Lydia's testimony that she generally marks up her clothing somewhere between 100% and 120%--and that the change in inventory (and inventory generally) was basically nil--we find that adjusted cost of goods sold amount is simply incredible. Because we can use the Cohan doctrine here, on the basis of Lydia's testimony, we think that allowing 50% of gross receipts would be appropriate. See Cohan, 39 F.2d at 543-44. Therefore, based on $86,629 of gross

[*68] receipts, we allow $43,315 for cost of goods sold (with no adjustment for the increase in returns and allowances). Any inexactitude in this estimate is of the Heinbockels' own making and is due to their failure to maintain adequate business records. See id.

It's a similar story for the remainder of the adjustments the Heinbockels made for Lydia's World's 2005 tax year. Substantially all of the increased amounts are supported either by a Quickbooks entry or a credit-card summary statement--but without any testimony to support the claimed the increases. Even when they provided an invoice, the Heinbockels kept such incomplete and disorganized records as to ensure that we can't tell whether those amounts were already allowed as deductions elsewhere. We therefore find that the Heinbockels have not met their burden to substantiate any deductions that the Commissioner didn't already allow for 2005. And to the extent that the Heinbockels conceded amounts lower than those reported on Lydia's World's 2005 Schedule C, we accept those concessions.

b.    2006

The only remaining adjustments the Heinbockels made for Lydia's World for 2006 were in the "other expenses" category. The Commissioner allowed all of the "other expenses" they claimed on the Schedule C, but in their posttrial brief the Heinbockels made the following adjustments:

| [*69]<br>Item | Claimed<br>on return | P claimed<br>in brief | R allowed in<br>NOD | R allowed<br>in brief |
|---|---|---|---|---|
| Bank card fees | $1,636 | $275 | $1,636 | N/A |
| Dues &<br>memberships | 2,418 | 50 | 2,418 | N/A |
| Internet | 1,200 | 2,601 | 1,200 | N/A |
| Merchandising | 4,931 | 3,536 | 4,931 | N/A |
| Outside services | 110 | 756 | 110 | N/A |
| Postage | 86 | -0- | 86 | N/A |
| Service charges | 612 | -0- | 612 | N/A |
| Total | 10,993 | 7,218 | 10,993 | N/A |

The Heinbockels provided no support for these adjustments--simply noting in a spreadsheet attached to their opening brief that these items "were not challenged by respondent." In his brief the Commissioner didn't respond to these various increases and decreases. We will accept the concessions the Heinbockels made but, because they didn't provide anything to substantiate the increased expenses, we have to disallow the claimed increases.

c.     2007

| Item | Claimed<br>on return | P claimed<br>in brief | R allowed in<br>NOD | R allowed<br>in brief |
|---|---|---|---|---|
| COGS | $73,062 | $79,715 | -0- | $73,062[1] |
| Legal | 1,200 | 900 | -0- | 900[2] |
| Taxes | 9,595 | 16,419 | -0- | 9,595 |
| Wages | 30,398 | -0- | -0- | -0-[2] |

| [*70] Interest | 2,992 | 2,992 | 2,992 | ? |
|---|---|---|---|---|
| Other expenses | 7,218 | 7,418 | -0- | 4,120 |

[1] The Commissioner's brief includes two separate tables for his concessions with respect to the 2007 expenses at issue for Lydia's World. For the most part, these two tables were in accord. However, the tables differed on concessions for cost of goods sold ($61,246 vs. $73,062) and other expenses ($4,120 vs. $3,536). We construe the Commissioner's inconsistencies in the light most favorable to the Heinbockels.

[2] Because the Heinbockels and the Commissioner agree in their respective briefs on these amounts, we allow the agreed-upon amounts and won't discuss them any further.

As noted earlier, Lydia's World's records were in shambles for 2007 when she hired Ritter. Ritter said that when he came on board, he "basically * * * took all the papers and recreated the whole year." From a combination of "bank statements, credit card statements, receipts, the check register, * * * and * * * actual invoices," he said he was able to create a profit and loss statement. Even after this process, Ritter said he wasn't necessarily able to track a particular invoice to an entry made in Lydia's books.

### i. COGS

After initially disallowing the entire cost of goods sold adjustment--a tad over $73,000--in his notice of deficiency the Commissioner now concedes that amount. But Lydia wants more, albeit not as much of an increase as she asked for 2005. Several obstacles stand in the way, however. First off, Lydia didn't properly

[*71] track inventory. Ritter testified that Lydia's World didn't have a running inventory and the Heinbockels didn't use Quickbooks to do inventory control. Even Ritter couldn't figure out how they traced the inventory's value. He also concluded that he had no way of knowing whether Lydia's personal purchases were included in cost of goods sold. The support for the new amount--another combination of Quickbooks entries, bank statements, credit-card statements, invoices, and the occasional receipt--doesn't provide any way to show whether purchases were double counted, or even if they were purchases for business and not for personal use. In light of gross receipts of about $130,000, the increased claim for cost of goods sold--almost $80,000--suggests that Lydia marked up her clothing only a tad over 60%, a far cry from her testimony that she generally had a markup of 100% to 120%. We find that Lydia has not adequately substantiated the claimed increase, but because the Commissioner conceded the amount originally claimed on the return, we do allow that amount.

ii.    Taxes

The notice of deficiency disallowed the entire $9,595 deduction for taxes and licenses, but the Commissioner allowed that amount on brief. But the Heinbockels now claim an additional $6,824. The Commissioner argues that they haven't substantiated the increase, but Lydia did provide two canceled checks, both payable

**[*72]** to the California State Board of Equalization, for the full amount. Lydia credibly testified that those checks paid sales tax due from Lydia's World, and this is adequate substantiation. We therefore allow the entire $16,419.

### iii. Interest

Although the Commissioner's brief would lead us to think otherwise, the notice of deficiency didn't disallow any of the $2,992 in interest claimed on Lydia's World's Schedule C. Now, however, the Commissioner does seem to challenge that amount, and he asserts that because the interest was charged by Lydia's personal credit-card issuers, the percentage of business use compared to her personal use is unknown. This particular item results in an increase in deficiency, so the Commissioner has the burden of proof. See Rule 142(a)(1). Although we share his concern with Lydia's commingling (as we discuss below), his mere allegation that the interest deduction should be disallowed because breakdown is "unknown" isn't sufficient to meet his burden of proof. We allow the entire amount.

[*73]                              iv.      Other expenses

The "other expenses" category is made up of the following items:

| Item | Claimed on return | P claimed in brief | R allowed in NOD | R allowed in brief |
|---|---|---|---|---|
| Bank-card fees | $275 | $275 | -0- | $275[1] |
| Dues & memberships | 50 | 50 | -0- | -0-[1] |
| Postage | 2,601 | 2,601 | -0- | 309 |
| Credit card fees | 3,536 | 3,536 | -0- | 3,536[1] |
| Misc | 756 | 656 | -0- | -0- |
| Promo donation | -0- | 300 | -0- | -0- |
| Total | 7,218 | 7,418 | -0- | 4,120 |

[1] Because the Heinbockels and the Commissioner agree in their respective briefs on these amounts, we allow them and won't discuss them any further.

On brief, the Commissioner concedes only $309 of the $2,601 in postage fees that Lydia deducted on her Schedule C. Lydia supported much of the rest with a noncontemporaneous spreadsheet and by pointing to items on her credit-card or bank statements. She did, however, support a handful of the expenses totaling $1,015 with invoices and receipts. We allow all of that amount. Of the remaining $1,586 claimed but only substantiated by credit-card statements or bank statements, we use Cohan but also recognize Lydia's admission that she commingled business and personal charges on that credit card, so we will allow only half of that

[*74] remaining amount--$793.  Therefore, the total amount of postage we allow is $1,808.

Lydia didn't provide any invoices or receipts to support her miscellaneous expenses or newly claimed promotional-donation expense.  Without invoices or receipts for any of these amounts, we won't use <u>Cohan</u> to estimate.  We disallow them all.

VI.    <u>Penalties</u>

The Commissioner determined that an accuracy-related penalty of 20% under section 6662 should apply to the underpayment of tax for each of the tax years at issue because the entire underpayment was attributable either to the Heinbockels' "negligence or disregard of rules or regulations" or to a "substantial understatement" of their income-tax liability.

We start with the first.  "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, including any failure to keep adequate books and records or to substantiate items properly.  <u>See</u> sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.

Under section 7491, the Commissioner bears the burden of production with respect to the section 6662 penalty.  This means that the Commissioner must come forward with sufficient evidence indicating that it's appropriate to impose the

[*75] relevant penalty. <u>Higbee</u>, 116 T.C. at 446. The Commissioner certainly showed here that the Heinbockels kept inadequate books and records. Their recordkeeping was shoddy, as one can see in the numerous (and sometimes very large) differences between what the Heinbockels originally claimed on their returns and what they argued to us. And many of these revisions either significantly changed the bottom line (e.g., Lydia's World) or significantly altered the character of the items initially reported (e.g., the lending activity). Even with the revised amounts, most of the records were insufficient to substantiate the claimed deductions. And the exceptional extent of commingled business and personal expenses shows a lack of a good-faith, reasonable attempt to ascertain the correctness of the deductions claimed. The Commissioner has met his burden of production.

Once the Commissioner has met his burden, taxpayers must come forward with persuasive evidence that the Commissioner's determination is incorrect. Rule 142(a); <u>Higbee</u>, 116 T.C. at 446-47. Taxpayers can meet this burden by proving that they acted with reasonable cause and in good faith. <u>See</u> sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs. But, other than their blanket assertion that they acted with reasonable cause and in good faith, the Heinbockels haven't produced any evidence to show why the penalty shouldn't apply to them. Looking at the facts

**[*76]** and circumstances--in light of the experience, knowledge, and education of the taxpayers--we cannot say that the Heinbockels acted with reasonable cause and in good faith. <u>See</u> sec. 1.666-4-4(a), Income Tax. Regs. Ed has an MBA, and, in his previous position as a controller, managed an accounting staff of 30 and a production staff of 350. He touted himself as really good at finance, and asserted that he "can do pro-formas until the cows come home." The Heinbockels have not argued that they relied on the advice of professional adviser, nor could they in good faith say so, as Ed admitted that their CPA just entered on their returns the information that Ed had provided him. We therefore sustain the Commissioner's determination that the Heinbockels are liable for the accuracy-related penalty on the ground of negligence for the entire amount of the underpayment for each of these years at issue.[13]

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[13] The Commissioner also argued that the Heinbockels are liable for the section 6662 penalty based on substantial understatements. Our finding of negligence means that we don't need to address this argument--the Commissioner gets only one 20% penalty.